UNPUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
          *Plaintiff-Appellant,*

v.

RICHARD S. BARTH,
          *Defendant-Appellee.*

No. 00-4172

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
Deborah K. Chasanow, District Judge.
(CR-99-310-DKC)

Argued: November 3, 2000

Decided: February 12, 2001

Before NIEMEYER and KING, Circuit Judges, and
Margaret B. SEYMOUR, United States District Judge
for the District of South Carolina, sitting by designation.

Vacated and remanded by unpublished per curiam opinion.

## COUNSEL

**ARGUED:** Sandra Wilkinson, Assistant United States Attorney,
Greenbelt, Maryland, for Appellant. Nathan Lewin, MILLER, CAS-
SIDY, LARROCA & LEWIN, L.L.P., Washington, D.C., for Appel-
lee. **ON BRIEF:** Lynne A. Battaglia, United States Attorney,
Greenbelt, Maryland, for Appellant. Jennifer M. O'Connor, MILLER,
CASSIDY, LARROCA & LEWIN, L.L.P., Washington, D.C., for
Appellee.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

**OPINION**

PER CURIAM:

The Government appeals the sentence imposed on Richard Barth for his conviction in the District of Maryland, pursuant to his guilty plea, for violating 18 U.S.C. § 2252A(a)(1) (illegal transportation, by computer, of child pornography in interstate commerce). We possess jurisdiction under 18 U.S.C. § 3742(b) and 28 U.S.C. § 1291. For the reasons set forth below, we vacate Barth's sentence and remand for resentencing.

I.

Richard Barth is a sixty-year-old father and grandfather, formerly employed by the federal government as a data standards manager. Under the plea agreement between Barth and the Government, the parties stipulated to the following events:

> In or about November 1998, Barth entered an Internet chat-room regarding "dad and daughter sex". Barth began communicating electronically via Internet Relay Chat (IRC) with a user using the screen name "beth15" whose profile included the fact that she was living in Illinois. During the course of their communications, Barth transmitted child pornography to "beth15" from his computer in Maryland to a computer in Illinois. One of the transmissions occurred on November 2, 1998. In subsequent electronic communications, Barth suggested that he and "beth15" meet for the purpose of engaging in sexual conduct. "Beth15" indicated to Barth that she was 14 years old. The meeting was scheduled in Chicago Illinois because Barth would be traveling from Maryland for purposes of attending a work related conference.

On or about November 12, 1998, Barth canceled the meeting with "beth15" stating in his transmission to her that he was being "watched" for "sexual improprieties" at his place of employment. According to Barth, he had previously scheduled a meeting with a business colleague at the same time and contends that he never had any actual intention of meeting "beth15." Barth made the business trip to Chicago.

On or about November 17, 1998, Barth was arrested in Chicago, Illinois. After being advised of his constitutional rights, Barth admitted to transmitting child pornography to "beth15" and that he had a collection of child pornography on the computer in the basement of his home.

On or about November 18, 1998, a consent search was conducted of Barth's home and a computer was seized. Hundreds of images of child pornography were identified on the computer, many of which involved a prepubescent minor or a minor under the age of twelve years. The government contends that images of sadistic and masochistic conduct or other depictions of violence were also found.

J.A. 8.

At Barth's sentencing, the Government provided evidence that in the course of exchanging pornography over the Internet, Barth engaged in sexually explicit chat. For instance, while communicating with "beth15," Barth expressed his desire to have sex with her, made repeated and graphic references to his genitals and her genitals, suggested that she smoke marijuana and drink alcohol, and, most importantly, made plans to meet her for the specific purpose of having sexual intercourse with her. Barth also urged her to keep the chat and visual images away from her family and the police.

More disturbingly, in their search of Barth's home computer, law enforcement officers found electronic conversations — with "beth15" and others — in which Barth boasted of raping his own granddaughter. For example, he wrote to "april12": "i did my 8 y/o granddaughter." J.A 475.[1] On various occasions, he described performing sexual

---

[1]Suffice it to say that Barth elaborated on his claim — that he "did" his granddaughter — in excruciatingly graphic language.

acts on the child, including but not limited to performing oral sex and inserting his fingers into her vagina. In the course of these conversations, Barth gave accurate and specific information about himself, including identifying information about his job, family background, and physical appearance.

Investigators followed up on these horrific disclosures. Upon confirming that Barth, in fact, had an eight-year-old granddaughter in New York, the FBI contacted the local authorities. The New York Administration on Children's Services interviewed the granddaughter and her parents, and it subsequently filed petitions in a New York family court seeking to have the granddaughter and her siblings declared abused children and placed in the state's protective custody. The petitions for custody identified not only Barth as an abuser, but also similarly identified the children's parents for failing to protect them from Barth's sexual abuse.

The ensuing New York investigation established that none of the sexual acts described by Barth had actually occurred, thus concluding that the allegations of sexual abuse were "unfounded." Barth voluntarily settled the New York proceedings by agreeing to a protective order which prevented him from having unsupervised contact with any of his grandchildren for one year.

Barth then entered his guilty plea to a criminal information, in which the United States Attorney charged him with violating 18 U.S.C. § 2252A(a)(1). At his sentencing, Barth proffered a series of specific grounds on which he sought downward departure; more generally, he emphasized the traumatic nature of the New York investigation, especially insofar as it implicated his daughter's family. The district court proved receptive to this entreaty, awarding Barth an eight point downward departure, which brought him from Level 18 to Level 10 under the Guidelines.[2] The district court justified this departure as follows:

---

[2]Though receptive to Barth's request for leniency, the district court rejected each of the factual grounds on which he had sought a downward departure. Indeed, the court made specific findings that Barth did not suffer from diminished mental capacity, J.A. 440, that his conduct was not aberrational, J.A. 437, that his charitable and community service were not "out of the ordinary," J.A. 437, that his acceptance of responsibility was not "extraordinary," J.A. 440, and that the harm to his family, though serious, was not "extraordinary." J.A. 440-41.

It is one thing for a defendant to have to face the consequences himself in terms of prison, if that is what it is, probation, a fine, what have you. In my experience, it is quite another thing to have to watch your family members go through the same kind of accusation that you have brought on yourself because of your conduct.

. . . [U]nderstanding that you have put your daughter and her family through that, and I suppose that some day the grandchildren may actually learn what it was all about . . . is punishment to Mr. Barth unlike that typically faced, or at least, to my knowledge, faced by others in his situation.

He dealt with it by doing what he could to further accept responsibility, that is, by agreeing to the restraining order in return for dropping this with no finding in a year, but it also constitutes in part a harm to the family that has already occurred and will continue to occur simply because of the nature of the chats that took place.

So I am calling this a combination of acceptance, but it is more additional punishment faced by the defendant due to the impact this had on his daughter and her family that I find does take this case out of the heartland.

J.A. 441-42.

The district court then imposed a twelve-month sentence on Barth, including ten months of home detention and two months of incarceration, followed by three years of supervised release. The Government has appealed Barth's sentence, insisting that the downward departure lacked a proper basis under the Sentencing Guidelines.

II.

It is settled that we review a district court's decision to award a downward departure for abuse of discretion. *See Koon v. United States*, 518 U.S. 81, 91 (1996); *United States v. Rybicki*, 96 F.3d 754, 756-57 (4th Cir. 1996). *Koon* instructs that a district court's decision

to depart will generally be entitled to "substantial deference, for it embodies the traditional exercise of discretion by a sentencing court." 518 U.S. at 98. The deference we accord such decisions reflects the special institutional competence that district courts possess in discerning which cases "fall outside the heartland" of cases governed by the Sentencing Guidelines. *Id.* As *Koon* also advises: "Whether a given factor is present to a degree not adequately considered by the Commission, or whether a discouraged factor nonetheless justifies departure because it is present in some unusual or exceptional way, are matters determined in large part by comparison with the facts of other Guidelines cases." *Id.*

III.

A.

While a sentencing court's decision to depart from the Guidelines generally should not be disturbed, appellate review is not an "empty exercise." *See id.* Downward departures may be reversed on appeal if the sentencing court relies on improper factors, e.g., "discouraged" factors, or if the reviewing court, evaluating the totality of the circumstances, concludes that the case is not so exceptional as to justify departure. *See United States v. DeBeir*, 186 F.3d 561, 566 (4th Cir. 1999). Reviewing courts can and will find an abuse of discretion where the "circumstances and consequences of [a] case do not render it sufficiently atypical or extraordinary to remove it from the heartland of cases covered by the applicable guideline." *See id.* at 564.

In *DeBeir*, we reviewed at length, in a not dissimilar factual situation, the permissible and impermissible types of *Koon* departures. The defendant in *DeBeir*, a male of fifty-eight, had pled guilty to travelling in interstate commerce with the intent to engage in a sexual act with a minor.[3] The district court departed three levels on the basis of a combination of factors which either singly or together indicated that

---

[3]DeBeir had exchanged numerous sexually explicit electronic communications with "Kathy," a federal agent adopting the persona of a fourteen-year-old girl, and the two had eventually arranged a meeting "so that he could teach her about oral sex." 186 F.3d at 564.

a longer sentence would have an adverse effect on DeBeir, "to an exceptional degree." *See id.* at 565.

Like Barth, DeBeir proffered a veritable laundry list of departure bases, including the "collateral consequences of incarceration" on his employment opportunities, his "unique psychological condition," his "unusual susceptibility to abuse in prison," the "impact of negative publicity," an assertion that the crime was "victimless" since the minor was actually an undercover FBI agent, and the defendant's age, extreme remorse, and post-offense rehabilitation effort. We concluded that none of these factors was so unique or extraordinary as to bring the case outside the heartland of similar cases. Judge Motz explained:

> We have studied the record thoroughly, including the parties' fine briefs, and have reviewed the entire complement of factors and circumstances contributing to the district court's departure decision and cannot conclude that any factor or group of factors brings this case outside the norm. The circumstances of this case are far removed from those found exceptional in existing case law; even when taken together, they cannot justify a departure.

*Id.* at 573.

Accordingly, we determined that the district court had abused its discretion in sentencing DeBeir, and we reversed. Discussing at length the purposes of the Sentencing Guidelines and their essential goal of eliminating inequality in sentencing, we recognized that a sentencing court may permissibly depart only in "extraordinary cases," and that such "heartland" departure cases are "'extremely rare.'" *Id.* at 566, quoting U.S.S.G. § 5K2.0 (Commentary). As in *DeBeir*, we conclude that the circumstances presented here are neither atypical nor extraordinary, but instead fall squarely within the heartland of child pornography prosecutions.

## B.

The Government asserts that, in this case, the district court improperly applied a hybrid theory of downward departure, i.e., "additional

punishment," based on the harm already inflicted on Barth's family — and, consequently, on his conscience — coupled with Barth's acceptance of responsibility in entering into the New York settlement agreement. While neither of these concerns would justify a downward departure if viewed independently, the court found their cumulative effect sufficient to remove Barth's case from the heartland.[4]

1.

The critical issue in our review of this sentence relates to the asserted "additional punishment" imposed on Barth as a result of the New York investigation. In this regard, we observe that defendants convicted of child pornography crimes are typically exposed to harsh and shameful *personal* consequences — including incarceration, impaired job prospects, and social stigma. Indeed, a child pornography defendant should readily expect that he will be investigated and restrained from contact with children. The sentencing court indicated, however, that such consequences would rarely extend to innocent family members as directly as they did in this case, apparently regarding the New York investigation as uniquely devastating. In the court's words: "[U]nderstanding that you have put your daughter and her family through that, and I suppose that some day the grandchildren may actually learn what it was all about . . . is punishment to Mr. Barth unlike that typically faced, or at least, to my knowledge, faced by others in his situation." J.A. 441-42.

According to the Government, this "additional punishment" rationale is unprecedented and legally impermissible. First, it was not the

---

[4]In effect, the district court here justified its downward departure under § 5K2.0 of the Guidelines, the same ground analyzed — and rejected — in *DeBeir*. In the Commentary accompanying § 5K2.0, the Sentencing Commission acknowledged the possibility of

> an extraordinary case that, because of a combination of [characteristics or circumstances that are ordinarily not relevant to departure], differs significantly from the "heartland" cases covered by the guidelines . . ., even though none of the individual characteristics or circumstances individually distinguishes the case.

U.S.S.G. § 5K2.0 (Commentary).

punishment of incarceration, but the defendant's own relevant misconduct which directly caused his family's suffering. Similarly, the Government observes that this "additional punishment" was not only foreseeable, but was a direct and inevitable consequence of Barth's misconduct. It also maintains that when there is such a close nexus between the criminal conduct and the collateral consequence, one may assume that the Guidelines have already taken that consequence into account.

Finally, the Government asserts that, even if the proffered rationale were permissible in some cases, the sentencing court abused its discretion in granting Barth an eight-level downward departure. There was simply nothing in the record to support a claim that Barth was punished any more or differently than others convicted of similar sex offenses. That his own relevant conduct — indeed his own words — dragged his family into an investigation is unfortunate, but not unusual. Sex offenders who have frequent contact with children often find that their lives are altered in that respect after conviction.

In response, Barth submits that the "additional punishment" at issue here was neither an inherent nor foreseeable consequence of his crime. We are unconvinced, and we find ourselves in agreement with the Government. Though the investigation of Barth's daughter and son-in-law may have been unusual, there is no reason for Barth to benefit from this anomaly. Presumably, any investigation would devastate the family, even if confined to his own behavior, i.e., even if his daughter's family had not been directly accused. The inconvenience here may have been unusually direct, but the family's suffering was well within the heartland of the crime. While deference is to be accorded the district court, our decisions instruct that heartland departures may be reversed when the defendant's punishment is not atypical or extraordinary in the context of the criminal act and relevant circumstances. *See, e.g.*, *DeBeir*, *supra*; *Rybicki*, 96 F.3d at 759 (concluding that job loss occasioned by a defendant's newly acquired status as convicted felon was "far from atypical" and did not merit departure).

## 2.

The sentencing court also identified a second factor — Barth's "acceptance of responsibility" — to support its downward departure on behalf of Barth. However, it is elementary that acceptance of responsibility is already accounted for under the Guidelines, and cannot serve as the basis for an additional departure unless "present to an exceptional degree or in some other way mak[ing] the case different from the ordinary case where the factor is present." *Koon*, 518 U.S. at 82. Although Barth's consent to the New York restraining order was not compelled, it hardly qualifies as an "extraordinary" acceptance of responsibility.[5] Indeed, given Barth's arrest and his revolting, though false, statements about his granddaughter, his agreement to the restraining order was a fairly minor concession. In our view, it would have been extraordinary if Barth had *not* consented to the restraining order. In short, we view Barth's "acceptance of responsibility" as nothing more than damage control — to be expected under the circumstances.

## IV.

We therefore conclude that neither the "additional punishment" which Barth suffered, nor his "acceptance of responsibility," considered individually or collectively, are so unique or extraordinary as to remove Barth's case from the "heartland" of similar cases. Because the downward departure granted to Barth constituted an abuse of discretion, we vacate his sentence and remand for resentencing.

*VACATED AND REMANDED*

---

[5]The sentencing court's invocation of this factor was especially inappropriate since Barth had already received a two-point downward departure for acceptance of responsibility under U.S.S.G. § 3E1.1, and the court had specifically found that Barth's acceptance of responsibility, viewed independently, was not "extraordinary."